

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JOHN CHILDS, DAVID FIORENTINO, ADAM
SUTTIN, and WILLIAM WATTS,

        Plaintiffs,

v.

CANYON PARTNERS INC., KKR ASSET
MANAGEMENT, AEGON USA INVESTMENT
MANAGEMENT LLC, AMERICAN FINANCIAL
GROUP, ANDALUSIAN CAPITAL PARTNERS
LP, ANDREW GROSSMAN, BULWARKBAY
INVESTMENT GROUP LLC, CONCISE
CAPITAL MANAGEMENT, LP, GRATIA
CAPITAL LLC, HOWARD BERGER, JEAN
TAYLOR, JEANNE A. GROSSMAN, KENNETH
S. GROSSMAN, LORD, ABBETT & CO., LLC,
MACQUARIE BANK LIMITED, PATRICIA
BERGER, R2 INVESTMENTS, VR CAPITAL
GROUP, WOLVERINE ASSET MANAGEMENT,
LLC, and WILMINGTON TRUST, N.A.,

        Defendants.

14 CV 2898

CASE NO.

## COMPLAINT

Plaintiffs, John Childs, David Fiorentino, Adam Suttin, and William Watts (together, the "Childs Bondholders"), for their Complaint against the above-named Defendants, state as follows:

### NATURE OF THE ACTION

1.    The Childs Bondholders are holders of 13.00% Second Lien Senior Secured Notes Due 2014 (the "Bonds") issued by Brookstone Company, Inc. ("Brookstone ") pursuant to an Indenture dated as of October 26, 2010. Defendant Wilmington Trust, N.A. ("Trustee") is the successor indenture trustee under that Indenture. The remaining Defendants (referred to herein as

the "Ad Hoc Committee" or the "Ad Hoc Committee Defendants") also hold Bonds pursuant to the Indenture. A copy of the Indenture is attached hereto as Exhibit A.

2.       In connection with Brookstone's recent bankruptcy filing, the Ad Hoc Committee orchestrated a discriminatory "roll-up" of $30 million of its Bonds at the expense of the Childs Bondholders and other bondholders. Specifically, as part of a debtor-in-possession ("DIP") financing, the Ad Hoc Committee arranged to "loan" the debtor (Brookstone) $30 million, which was promptly returned to the members of the Ad Hoc Committee to retire $30 million of their own Bonds. As a result of this roundtrip transaction – little more than effectively moving $30 million of the Ad Hoc Committee's money from its left pocket to its right pocket – the Ad Hoc Committee's debt was transformed from debt similarly situated to the debt of all other holders of the Bonds to "new" debt with a payment priority in bankruptcy over the Bonds held by the Childs Bondholders and other bondholders (who were excluded from the roll-up). The only point to the roll-up was for the Ad Hoc Committee to profit at the expense of the other bondholders by coercing Brookstone to agree to go along with a superpriority for some but not all of the pre-petition bondholders.

3.       In violation of its duty to treat all bondholders equally, the Trustee approved and implemented the discriminatory roll-up. The members of the Ad Hoc Committee wrongfully induced and facilitated the Trustee's breach to unjustly enrich themselves at the expense of the Childs Bondholders and other bondholders.

4.       As a result of the discriminatory roll-up, the Bonds held by the Childs Bondholders are worth substantially less than what they would have been worth in the absence of the roll-up. Plaintiffs estimate their damages as a result of the Defendants' wrongful conduct to be approximately $1 million.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction of this matter under 28 U.S.C. § 1331 as a civil action arising under the laws of the United States, and under 15 U.S.C. § 77vvv(b) as an action to enforce liabilities and duties created by the Trust Indenture Act. The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy under Article III of the United States Constitution.

6.      Venue is proper with respect to Plaintiffs' claims under the Trust Indenture Act because the Trustee transacts business in this District. 15 U.S.C. § 77v(a), as incorporated into 15 U.S.C. § 77vvv(b). Venue is proper with respect to Plaintiffs' common law claims pursuant to 28 U.S.C. § 1391(b)(3) and pursuant to Section 6.16 of that certain Intercreditor Agreement dated as of October 26, 2010, attached hereto as Exhibit B.

## PARTIES

7.      Plaintiff John Childs is the holder of $4,412,120 in principal amount of the Bonds.

8.      Plaintiff David Fiorentino is the holder of $120,880 in principal amount of the Bonds.

9.      Plaintiff Adam Suttin is the holder of $906,600 in principal amount of the Bonds.

10.     Plaintiff William Watts is the holder of $604,400 in principal amount of the Bonds.

11.     Defendant Canyon Partners Inc. ("Canyon") is a member of the Ad Hoc Committee and a holder of at least $25,612,000 in principal amount of the Bonds.

12.     Defendant KKR Asset Management ("KKR") is a member of the Ad Hoc Committee and a holder of at least $12,577,000 in principal amount of the Bonds.

13.     Defendant Aegon USA Investment Management LLC is member of the Ad Hoc Committee and a holder of at least $7,630,000 in principal amount of the Bonds.

14. Defendant American Financial Group is a member of the Ad Hoc Committee and a holder of at least $3,910,000 in principal amount of the Bonds.

15. Defendant Andalusian Capital Partners LP is a member of the Ad Hoc Committee and a holder of at least $3,398,000 in principal amount of the Bonds.

16. Defendant Andrew Grossman is a member of the Ad Hoc Committee and a holder of at least $170,000 in principal amount of the Bonds.

17. Defendant BulwarkBay Investment Group LLC is a member of the Ad Hoc Committee and a holder of at least $2,000,000 in principal amount of the Bonds.

18. Defendant Concise Capital Management, LP is a member of the Ad Hoc Committee and a holder of at least $1,100,000 in principal amount of the Bonds.

19. Defendant Gratia Capital LLC is a member of the Ad Hoc Committee and a holder of at least $3,350,000 in principal amount of the Bonds.

20. Defendant Howard Berger is a member of the Ad Hoc Committee and a holder of at least $225,000 in principal amount of the Bonds.

21. Defendant Jean Taylor is a member of the Ad Hoc Committee and a holder of at least $305,000 in principal amount of the Bonds.

22. Defendant Jeanne A. Grossman is a member of the Ad Hoc Committee and a holder of at least $375,000 in principal amount of the Bonds.

23. Defendant Kenneth S. Grossman is a member of the Ad Hoc Committee and a holder of at least $3,856,000 in principal amount of the Bonds.

24. Defendant Lord, Abbett & Co. LLC is a member of the Ad Hoc Committee and a holder of at least $10,425,000 in principal amount of the Bonds.

25.     Defendant Macquarie Bank Limited is a member of the Ad Hoc Committee and a holder of at least $2,000,000 in principal amount of the Bonds.

26.     Defendant Patricia Berger is a member of the Ad Hoc Committee and a holder of at least $515,000 in principal amount of the Bonds.

27.     Defendant R2 Investments is a member of the Ad Hoc Committee and a holder of at least $5,991,000 in principal amount of the Bonds.

28.     Defendant VR Capital Group is a member of the Ad Hoc Committee and a holder of at least $13,202,000 in principal amount of the Bonds.

29.     Defendant Wolverine Asset Management, LLC is a member of the Ad Hoc Committee and a holder of at least $5,033,000 in principal amount of the Bonds.

30.     Defendant Wilmington Trust, N.A. is a national bank organized under the laws of the United States and which does business in this District. In or around January 2014, Wilmington Trust assumed the role of Trustee under the Indenture from Wells Fargo Bank, N.A.

## BACKGROUND

31.     The Childs Bondholders purchased their Bonds on the open market in 2011.

32.     In January 2014, Brookstone defaulted on the Bonds by failing to make a scheduled interest payment.

33.     At around the same time, Brookstone solicited proposals for DIP financing in connection with an anticipated voluntary bankruptcy petition pursuant to Chapter 11 of the Bankruptcy Code. Brookstone received four DIP financing proposals, including a proposal from its senior lender, Wells Fargo.

34.     Canyon and KKR, who together held approximately $38 million of the Bonds, formed the so-called Ad Hoc Committee and proposed a DIP financing containing a discriminatory "roll-up" provision. Pursuant to the roll-up, members of the Ad Hoc Committee

nominally "loaned" $30 million to Brookstone, but in reality paid $30 million to themselves, to retire a substantial amount of their pre-petition Bonds. That $30 million payment would then be treated as "new" debt and given a payment priority over the Bonds held by those excluded from the roll-up. The roll-up serves no purpose other than to discriminate against other bondholders in the same class.

35.    When Canyon's and KKR's proposal was revealed, other bondholders forced their way on to the Ad Hoc Committee and into the discriminatory roll-up scheme. However, the Ad Hoc Committee still excluded the Childs Bondholders and others. After all, the only point to the roll-up was for some bondholders to profit at the expense of others by demanding a superpriority for some but not all of the pre-petition bondholders. If all bondholders had been allowed to participate, the roll-up would have offered no economic advantage to the members of the Ad Hoc Committee.

36.    Although Brookstone had a much less expensive DIP financing offer from Wells Fargo that did not contain any discriminatory roll-up of pre-petition debt, the Ad-Hoc Committee coerced Brookstone to accept its DIP financing and the discriminatory roll-up by threatening to withhold support for the company's restructuring plan. In other words, the Ad-Hoc Committee demanded a preferential payment in the form of the discriminatory roll-up in order to sign on to the restructuring plan.

37.    Brookstone filed a voluntary bankruptcy petition on April 3, 2014, in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

38.    On April 4, 2014, the Bankruptcy Court held a hearing to address the proposed DIP financing and roll-up. Although the Childs Bondholders objected to the roll-up, the Trustee

6

(at the behest of the Ad Hoc Committee) appeared in support of the Ad Hoc Committee's discriminatory proposal.

39.     The Bankruptcy Court entered an Order granting interim approval to the DIP financing, but voiced concerns about how it was structured. With respect to the discriminatory roll-up, the Court held:

> [W]hile there was an argument made that there's an issue about fairness, the fairness issue relates to [] relationships [among] the bondholders, not with respect to the fairness of the DIP or the appropriateness of its terms. ... I will, however, make special mention of the roll-up. ***Roll-ups are things, as everyone in the courtroom knows, the Court would generally view with a jaundiced eye. ...-- especially a first-day roll-up.*** But this is a circumstance in which the first lien lender is being paid in full, and the roll-up is only of a partial $30 million out of a hundred-twenty-plus-million-dollar debt. And if the proposed purchase price is any indication of the value, the roll-up certainly was secured prepetition, and there is no harm to the estate in confirming it as secured debt. Let's put it that way. And I say that only for purposes of the first day, and ***not meaning in any way to make a determination about anybody's secured claim, and at what number it should be allowed or not.***

(April 4, 2014 Hearing Tr. at 57:1-23 (emphasis added).)

40.     The discriminatory roll-up engineered by the Ad Hoc Committee and approved and implemented by the Trustee violates various anti-discrimination and other provisions of the Indenture pursuant to which the Bonds were issued. That Indenture provides, among other things, that:

- If less than all of the Bonds are to be redeemed, that redemption is to be on a "pro rata basis." (Indenture § 3.02) *Here, the "roll-up" amounts to a partial redemption of the Bonds, but that redemption was not on a pro rata basis, because the Childs Bondholders and other bondholders were excluded.*

7

- "[T]he right of any Holder of a Note to receive payment of principal, premium if any, and interest on the Note, on or after the respective due dates expressed in the Note … shall not be impaired or affected without the consent of such Holder." (Indenture § 6.07) *Here, the discriminatory "roll-up" adversely affects – without their consent – the right of the Childs Bondholders and other bondholders to receive payment of principal and interest on the same terms as originally agreed to by all the bondholders.*

- Any consideration given to induce a bondholder to amend or waive any terms of the bonds shall be offered to all bondholders equally. (Indenture § 4.16) *Here, the opportunity to participate in the "roll-up" and thus effectively amend the terms of the Bonds was not offered to the Childs Bondholders and other bondholders.*

- "[T]he Trustee may refuse to follow any direction [of a majority of bondholders] that conflicts with law or this Indenture that the Trustee determines may be unduly prejudicial to the rights of other Holders of Notes…." (Indenture § 6.05) *As noted herein, the discriminatory roll-up pursued by the Ad Hoc Committee and implemented by the Trustee conflicts with the Indenture and other law, significantly devalues the Childs Bondholders' Bonds and is unduly prejudicial to the Childs Bondholders and other bondholders.*

- Bondholders will receive at least 30 days' notice of any redemption. *No such notice was provided here.*

41.    Despite its obligations to treat all bondholders equally and to not permit the majority to unduly prejudice the rights of the other bondholders, the Trustee approved and implemented the discriminatory roll-up that benefitted the Ad Hoc Committee at the expense of

the Childs Bondholders and others. By doing so, the Trustee breached the Trust Indenture Act and its contractual and fiduciary duties. The Ad Hoc Committee induced the Trustee's breach.

42.     As a result of the discriminatory roll-up, the Bonds held by the Childs Bondholders are worth substantially less than what they would have been worth in the absence of the roll-up. Plaintiffs estimate their damages as a result of the Defendants' wrongful conduct to be approximately $1 million.

## COUNT ONE

### Violation of the Trust Indenture Act
### (Against the Trustee)

43.     Plaintiffs restate and incorporate by reference herein the allegations set forth in paragraphs 1 through 42 above as though fully set forth herein.

44.     As early as January 15, 2014, the Bonds were in default.

45.     Under the Trust Indenture Act, 15 U.S.C. § 77ooo(c), upon default, the Trustee was obligated to "use the same degree of care and skill … as a prudent man would exercise or use under the circumstances in the conduct of his own affairs."

46.     The Trustee violated this fiduciary obligation, by failing to act in a timely, reasonable and prudent manner to protect the interests of the bondholders, like the Childs Bondholders, disadvantaged by the discriminatory roll-up. Instead, the Trustee approved and implemented the discriminatory roll-up.

47.     As a direct and proximate result of the Trustee's breach of duties, the Childs Bondholders have suffered damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs John Childs, David Fiorentino, Adam Suttin and William Watts respectfully request that the Court enter judgment in their favor of Plaintiffs and against the Trustee, including as follows:

(a)     awarding Plaintiffs compensatory damages; and

(b)     awarding such other relief as this Court deems just and reasonable.

## COUNT TWO

### Breach of Contract
### (Against the Trustee)

48.     Plaintiffs restate and incorporate by reference herein the allegations set forth in paragraphs 1 through 47 above as though fully set forth herein.

49.     Plaintiffs, by their holding of the Bonds, and the Trustee, as successor to Wells Fargo Bank, N.A., are parties to that certain Indenture dated as of October 26, 2010.

50.     Plaintiffs have performed all of their obligations under the Indenture and the Notes.

51.     The Trustee has breached its obligations under the Indenture by, among other things:

(a) approving and implementing the discriminatory roll-up, despite its obligation under Section 6.05 of the Indenture to refuse to take action that may be unduly prejudicial to the rights of other holders of the Notes;

(b) approving and implementing the discriminatory roll-up in violation of Sections 6.07 and 6.09 of the Indenture, both of which prohibit the Trustee from impairing the rights of bondholders to payment or otherwise without the bondholders consent;

(c) implementing a partial redemption of the Bonds without providing for distribution of the proceeds of that redemption on a pro rata basis as required by Section 3.02 of the Indenture;

(d) approving and implementing payment to members of the Ad Hoc Committee when such payment was not offered to be paid to all holders of the Bonds, in violation of Section 4.16 of the Indenture; and

(e) failing to pursue any available remedies to enforce the terms of the Indenture and to protect the interests of the Childs Bondholders and other bondholders not permitted to participate in the discriminatory roll-up, in violation of Sections 6.03 of the Indenture.

52.     As a direct and proximate result of Trustee's breaches of the Indenture, Plaintiffs have suffered damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs John Childs, David Fiorentino, Adam Suttin and William Watts respectfully request that the Court enter judgment in their favor of Plaintiffs and against the Trustee, including as follows:

(a)     awarding Plaintiffs compensatory damages; and

(b)     awarding such other relief as this Court deems just and reasonable.

### COUNT THREE

**Breach of Fiduciary Duty**
**(Against the Trustee)**

53.     Plaintiffs restate and incorporate by reference herein the allegations set forth in paragraphs 1 through 52 above as though fully set forth herein.

54.     Upon Brookstone's default on the Bonds, the Trustee owed Plaintiffs a fiduciary duty to treat all bondholders equally and to not permit the majority to unduly prejudice the rights of Plaintiffs.

55.     The Trustee, by supporting and implementing the discriminatory roll-up for the benefit of the Ad Hoc Committee and to the detriment of the Childs Bondholders and others, violated its fiduciary duties to the Child Bondholders.

56.   The Childs Bondholders have been damaged by the Trustee's breaches of duty.

WHEREFORE, Plaintiffs John Childs, David Fiorentino, Adam Suttin and William Watts respectfully request that the Court enter judgment in their favor of Plaintiffs and against the Ad Hoc Committee Defendants, including as follows:

(a)   awarding Plaintiffs compensatory damages; and

(b)   awarding such other relief as this Court deems just and reasonable.

## COUNT FOUR

**Aiding and Abetting**
**(Against the Ad Hoc Committee Defendants)**

57.   Plaintiffs restate and incorporate by reference herein the allegations set forth in paragraphs 1 through 56 above as though fully set forth herein.

58.   The Trustee breached its fiduciary duties to Plaintiffs.

59.   The Ad Hoc Committee Defendants knowingly induced and procured the Trustee's breaches of its duties to Plaintiffs.

60.   The Ad Hoc Committee Defendants knowingly participated in the Trustee's breaches of its duties by providing substantial assistance to the Trustee.

61.   Plaintiffs have suffered damages as a result of Trustee's breach.

WHEREFORE, Plaintiffs John Childs, David Fiorentino, Adam Suttin and William Watts respectfully request that the Court enter judgment in their favor of Plaintiffs and against the Ad Hoc Committee Defendants, including as follows:

(a)   awarding Plaintiffs compensatory damages; and

(b)   awarding such other relief as this Court deems just and reasonable.

## COUNT FIVE

### Unjust Enrichment (In the Alternative)
### (Against the Ad Hoc Committee Defendants)

62.     Plaintiffs restate and incorporate by reference herein the allegations set forth in paragraphs 1 through 61 above as though fully set forth herein.

63.     By their participation in the discriminatory roll-up, the Ad Hoc Committee Defendants have been enriched at Plaintiffs' expense.

64.     Equity and good conscience militate against permitting the Ad Hoc Committee Defendants to retain the benefit they received from the discriminatory roll-up.

WHEREFORE, Plaintiffs John Childs, David Fiorentino, Adam Suttin and William Watts respectfully request that the Court enter judgment in their favor of Plaintiffs and against the Ad Hoc Committee Defendants, including as follows:

(a)     awarding Plaintiffs compensatory damages;

(b)     in the alternative, ordering the imposition of a constructive trust over, and the disgorgement of, any benefit received by the Ad Hoc Committee Defendants as a result of their participation in the discriminatory roll-up, the exact amount to be determined according to the proof at trial; and

(c)     awarding such other relief as this Court deems just and reasonable.

Dated:  April 23, 2014                          Respectfully submitted,

                                                **TANNENBAUM HELPERN SYRACUSE**
                                                **& HIRSCHTRITT LLP**

                                                _____
                                                Paul D. Sarkozi
                                                Richard W. Trotter

                                                900 Third Avenue
                                                New York, New York 10022
                                                Phone: (212) 508-6700
                                                Fax: (212) 371-1084
                                                Email: sarkozi@thsh.com
                                                       trotter@thsh.com

                                                *Attorneys for Plaintiffs*

14

# EXHIBIT A

**Exhibit 4.1**

**Execution Copy**

BROOKSTONE COMPANY, INC.

AND EACH OF THE GUARANTORS PARTY HERETO

13.00% SECOND LIEN SENIOR SECURED NOTES DUE 2014

---

INDENTURE

Dated as of October 26, 2010

---

WELLS FARGO BANK, N.A.

Trustee

---

NY-730311 v10

## CROSS-REFERENCE TABLE*

| Trust Indenture Act Section | | Indenture Section |
|---|---|---|
| 310 | (a)(1) | 7.10 |
|  | (a)(2) | 7.10 |
|  | (a)(3) | N.A. |
|  | (a)(4) | N.A. |
|  | (a)(5) | 7.10 |
|  | (b) | 7.10 |
|  | (c) | N.A. |
| 311 | (a) | 7.11 |
|  | (b) | 7.11 |
|  | (c) | N.A. |
| 312 | (a) | 2.05 |
|  | (b) | 13.03 |
|  | (c) | 13.03 |
| 313 | (a) | 7.06 |
|  | (b)(1) | 10.03 |
|  | (b)(2) | 7.06; 7.07 |
|  | (c) | 7.06; 10.03; 13.02 |
|  | (d) | 7.06 |
| 314 | (a) | 4.03;13.02; 13.05 |
|  | (b) | N.A. |
|  | (c)(1) | 13.04 |
|  | (c)(2) | 13.04 |
|  | (c)(3) | N.A. |
|  | (d) | 10.04 |
|  | (e) | 13.05 |
|  | (f) | N.A. |
| 315 | (a) | 7.01 |
|  | (b) | 7.05; 13.02 |
|  | (c) | 7.01 |
|  | (d) | 7.01 |
|  | (e) | 6.11 |
| 316 | (a) (last sentence) | 2.09 |
|  | (a)(1)(A) | 6.05 |
|  | (a)(1)(B) | 6.04 |
|  | (a)(2) | N.A. |
|  | (b) | 6.07 |
|  | (c) | 2.12 |
| 317 | (a)(1) | 6.08 |
|  | (a)(2) | 6.09 |
|  | (b) | 2.04 |
| 318 | (a) | 13.01 |
|  | (b) | N.A. |
|  | (c) | 13.01 |

N.A.  means not applicable.

* This Cross Reference Table is not part of the Indenture.

## TABLE OF CONTENTS

*Page*

ARTICLE I DEFINITIONS AND INCORPORATION BY REFERENCE.................................. 1

Section 1.01   Definitions..................................................................1
Section 1.02   Other Definitions. ........................................................32
Section 1.03   Incorporation by Reference of Trust Indenture Act...................................32
Section 1.04   Rules of Construction. ...................................................33

ARTICLE II THE NOTES ....................................................................... 33

Section 2.01   Form and Dating. ........................................................33
Section 2.02   Execution and Authentication...............................................35
Section 2.03   Registrar and Paying Agent. ...............................................35
Section 2.04   Paying Agent to Hold Money in Trust.........................................36
Section 2.05   Holder Lists..............................................................36
Section 2.06   Transfer and Exchange. ...................................................36
Section 2.07   Replacement Notes. ......................................................47
Section 2.08   Outstanding Notes. .......................................................47
Section 2.09   Treasury Notes. ..........................................................48
Section 2.10   Temporary Notes. ........................................................48
Section 2.11   Cancellation. .............................................................48
Section 2.12   Defaulted Interest. ........................................................49

ARTICLE III REDEMPTION AND PREPAYMENT .............................................. 49

Section 3.01   Notices to Trustee. .......................................................49
Section 3.02   Selection of Notes to Be Redeemed or Purchased...............................49
Section 3.03   Notice of Redemption. ....................................................50
Section 3.04   Effect of Notice of Redemption. .............................................51
Section 3.05   Deposit of Redemption or Purchase Price. .....................................51
Section 3.06   Notes Redeemed or Purchased in Part. ........................................52
Section 3.07   Optional Redemption. .....................................................52
Section 3.08   Mandatory Redemption. ...................................................52
Section 3.09   Offer to Purchase by Application of Excess Proceeds..............................53

ARTICLE IV COVENANTS ..................................................................... 54

Section 4.01   Payment of Notes. ........................................................54
Section 4.02   Maintenance of Office or Agency.............................................55
Section 4.03   Reports. .................................................................55
Section 4.04   Compliance Certificate. ...................................................56
Section 4.05   Taxes. ..................................................................57
Section 4.06   Stay, Extension and Usury Laws. ............................................57
Section 4.07   Restricted Payments.......................................................57
Section 4.08   Dividend and Other Payment Restrictions Affecting Subsidiaries............61

i

Section 4.09    Incurrence of Indebtedness and Issuance of Preferred Stock. ..................62
Section 4.10    Asset Sales. ..................................................................................65
Section 4.11    Transactions with Affiliates. ...........................................................67
Section 4.12    Liens. ..........................................................................................69
Section 4.13    Business Activities..........................................................................69
Section 4.14    Corporate Existence. ......................................................................69
Section 4.15    Offer to Repurchase Upon Change of Control. ....................................69
Section 4.16    Payments for Consent. ...................................................................71
Section 4.17    Additional Note Guarantees.............................................................71
Section 4.18    Designation of Restricted and Unrestricted Subsidiaries.........................71

ARTICLE V SUCCESSORS.................................................................................... 72

Section 5.01    Merger, Consolidation or Sale of Assets. ...........................................72
Section 5.02    Successor Corporation Substituted. ..................................................74

ARTICLE VI DEFAULTS AND REMEDIES ............................................................. 75

Section 6.01    Events of Default. ..........................................................................75
Section 6.02    Acceleration. .................................................................................77
Section 6.03    Other Remedies.............................................................................78
Section 6.04    Waiver of Past Defaults. .................................................................78
Section 6.05    Control by Majority. ......................................................................78
Section 6.06    Limitation on Suits. .......................................................................78
Section 6.07    Rights of Holders of Notes to Receive Payment. .................................79
Section 6.08    Collection Suit by Trustee. ..............................................................79
Section 6.09    Trustee May File Proofs of Claim. ....................................................79
Section 6.10    Priorities.....................................................................................80
Section 6.11    Undertaking for Costs. ...................................................................80

ARTICLE VII TRUSTEE ...................................................................................... 80

Section 7.01    Duties of Trustee...........................................................................80
Section 7.02    Rights of Trustee...........................................................................81
Section 7.03    Individual Rights of Trustee. ...........................................................82
Section 7.04    Trustee's Disclaimer. .....................................................................83
Section 7.05    Notice of Defaults. ........................................................................83
Section 7.06    Reports by Trustee to Holders of the Notes.........................................83
Section 7.07    Compensation and Indemnity. .........................................................84
Section 7.08    Replacement of Trustee. .................................................................85
Section 7.09    Successor Trustee by Merger, etc. ....................................................86
Section 7.10    Eligibility; Disqualification. ...........................................................86
Section 7.11    Preferential Collection of Claims Against Company...............................86

ARTICLE VIII LEGAL DEFEASANCE AND COVENANT DEFEASANCE....................... 86

Section 8.01    Option to Effect Legal Defeasance or Covenant Defeasance....................86
Section 8.02    Legal Defeasance and Discharge. .....................................................86

ii

Section 8.03   Covenant Defeasance...................................................................87
Section 8.04   Conditions to Legal or Covenant Defeasance...............................88
Section 8.05   Deposited Money and Government Securities to be Held in Trust;
                Other Miscellaneous Provisions. ...............................................89
Section 8.06   Repayment to Company................................................................89
Section 8.07   Reinstatement.............................................................................90

ARTICLE IX AMENDMENT, SUPPLEMENT AND WAIVER ....................................... 90

Section 9.01   Without Consent of Holders of Notes...........................................90
Section 9.02   With Consent of Holders of Notes................................................91
Section 9.03   Compliance with Trust Indenture Act...........................................93
Section 9.04   Revocation and Effect of Consents..............................................93
Section 9.05   Notation on or Exchange of Notes................................................93
Section 9.06   Trustee to Sign Amendments, etc. ...............................................93

ARTICLE X COLLATERAL AND SECURITY ............................................................. 94

Section 10.01  Equal and Ratable Sharing of Collateral by Holders of Parity Lien
                Debt. .........................................................................................94
Section 10.02  Ranking of Parity Liens. .............................................................94
Section 10.03  Relative Rights............................................................................95
Section 10.04  Compliance with Trust Indenture Act...........................................95
Section 10.05  Further Assurances; Insurance......................................................96
Section 10.06  Release of Liens in Respect of Notes. ...........................................97
Section 10.07  Appointment of Collateral Agent..................................................98

ARTICLE XI NOTE GUARANTEES ....................................................................... 98

Section 11.01  Guarantee. .................................................................................98
Section 11.02  Limitation on Guarantor Liability.................................................99
Section 11.03  Execution and Delivery of Note Guarantee. .................................100
Section 11.04  Guarantors May Consolidate, etc., on Certain Terms.....................100
Section 11.05  Releases.....................................................................................101

ARTICLE XII SATISFACTION AND DISCHARGE ..................................................... 102

Section 12.01  Satisfaction and Discharge...........................................................102
Section 12.02  Application of Trust Money..........................................................103

ARTICLE XIII MISCELLANEOUS .......................................................................... 103

Section 13.01  Trust Indenture Act Controls. ......................................................103
Section 13.02  Notices......................................................................................103
Section 13.03  Communication by Holders of Notes with Other Holders of Notes.......105
Section 13.04  Certificate and Opinion as to Conditions Precedent.......................105
Section 13.05  Statements Required in Certificate or Opinion...............................105
Section 13.06  Rules by Trustee and Agents. ......................................................106

Section 13.07  No Personal Liability of Directors, Officers, Employees and
               Stockholders.................................................................106
Section 13.08  Governing Law; Waiver of Jury Trial. ................................106
Section 13.09  No Adverse Interpretation of Other Agreements. ...................106
Section 13.10  Successors.....................................................................106
Section 13.11  Severability. ..................................................................106
Section 13.12  U.S.A. Patriot Act. .........................................................107
Section 13.13  Force Majeure ...............................................................107
Section 13.14  Counterpart Originals.......................................................107
Section 13.15  Table of Contents, Headings, etc. ......................................107

## EXHIBITS

Exhibit A1      FORM OF NOTE

Exhibit A2      FORM OF REGULATION S TEMPORARY GLOBAL NOTE

Exhibit B       FORM OF CERTIFICATE OF TRANSFER

Exhibit C       FORM OF CERTIFICATE OF EXCHANGE

Exhibit D       FORM OF CERTIFICATE OF ACQUIRING ACCREDITED INVESTOR

Exhibit E       FORM OF NOTATION OF GUARANTEE

Exhibit F       FORM OF SUPPLEMENTAL INDENTURE

Exhibit G       FORM OF INTERCREDITOR AGREEMENT

Exhibit H       FORM OF SECURITY AGREEMENT

Exhibit I       FORM OF INTELLECTUAL PROPERTY SECURITY AGREEMENT

Exhibit J       FORM OF COLLATERAL AGENCY AGREEMENT

INDENTURE dated as of October 26, 2010 among Brookstone Company, Inc., a New Hampshire corporation, the Guarantors (as defined) and Wells Fargo Bank, N.A., as trustee.

The Company, the Guarantors and the Trustee agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders (as defined) of the 13.00% Second Lien Senior Secured Notes due 2014 (the "Notes"):

ARTICLE I
DEFINITIONS AND INCORPORATION
BY REFERENCE

Section 1.01   Definitions.

"144A Global Note" means a Global Note substantially in the form of Exhibit A1 hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee that will be issued in a denomination equal to the outstanding principal amount of the Notes sold in reliance on Rule 144A.

"Accredited Investor" means a Person that is an "accredited investor" as defined in Rule 501 under the Securities Act, who is not also a QIB or a Non U.S. Person.

"Acquired Debt" means, with respect to any specified Person:

(1)     Indebtedness of any other Person existing at the time such other Person is merged with or into or became a Restricted Subsidiary of such specified Person, whether or not such Indebtedness is incurred in connection with, or in contemplation of, such other Person merging with or into, or becoming a Restricted Subsidiary of, such specified Person; and

(2)     Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"Act of Required Debtholders" means, (i) for so long as the Credit Agreement is outstanding, an act of the Credit Agreement Agent and (ii) as to any matter at any time thereafter:

(1)     prior to the Discharge of Priority Lien Obligations, a direction in writing delivered to the Priority Lien Collateral Agent by or with the written consent of the holders of more than 50% of the sum of:

(a)     the aggregate outstanding principal amount of Priority Lien Debt (including outstanding letters of credit whether or not then available or drawn); and

(b)     other than in connection with the exercise of remedies, the aggregate unfunded commitments to extend credit which, when funded, would constitute Priority Lien Debt; and

1

(2)     at any time after the Discharge of Priority Lien Obligations, a direction in writing delivered to the Collateral Agent by or with the written consent of the holders of Parity Debt representing the Required Parity Lien Debtholders.

For purposes of this definition, (a) Secured Debt registered in the name of, or beneficially owned by, the Company or any Affiliate of the Company will be deemed not to be outstanding, and (b) votes will be determined in accordance with the provisions described in Section 6.2 of the Intercreditor Agreement.

"Additional Notes" means additional Notes (other than the Initial Notes) issued from time to time under this Indenture in accordance with Sections 2.02 and 4.09 hereof, as part of the same series as the Initial Notes.

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise. For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"Agent" means any Registrar, co-registrar, Paying Agent or additional paying agent.

"AI Global Note" means a Global Note substantially in the form of Exhibit A1 bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of and registered in the name of the Depositary or its nominee that will be issued in a denomination equal to the outstanding principal amount of the Notes sold to Accredited Investors.

"Amended Offer and Consent Statement" means the Company's Amended Offer to Exchange or Purchase and Consent Solicitation dated September 17, 2010 relating to an amended offer to acquire Old Notes.

"Applicable Procedures" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depositary, Euroclear and Clearstream that apply to such transfer or exchange.

"Asset Sale" means:

(1)     the sale, lease, conveyance or other disposition of any assets other than in the ordinary course of business; provided that the sale, conveyance or other disposition of all or substantially all of the assets of Holdings and the Restricted Subsidiaries taken as a whole will be governed by the provisions Section 4.15 and/or Section 5.01 hereof and not by the provisions of Section 4.10 hereof; and

(2)     the issuance of Equity Interests in any of the Restricted Subsidiaries or the sale of Equity Interests in any of the Restricted Subsidiaries.

Notwithstanding the preceding, none of the following items will be deemed to be an Asset Sale:

(1)     any single transaction or series of related transactions that involves assets having a Fair Market Value of less than $2.5 million;

(2)     a transfer of assets between or among Holdings and/or the Restricted Subsidiaries;

(3)     an issuance of Equity Interests by a Restricted Subsidiary to Holdings or to another Restricted Subsidiary or the issuance of Equity Interests by a Restricted Subsidiary in which Holdings' percentage interest (direct and indirect) in the Equity Interests of such Restricted Subsidiary, after giving effect to such issuance, is at least equal to its percentage interest prior thereto;

(4)     the sale, lease, conveyance or other disposition of assets in the ordinary course of business and any sale or other disposition of damaged, worn-out, surplus or obsolete assets in the ordinary course of business;

(5)     the sale or other disposition of cash or Cash Equivalents;

(6)     a Restricted Payment that does not violate Section 4.07 hereof or a Permitted Investment;

(7)     the licensing or sublicensing of intellectual property, customer lists or other general intangibles and licenses, leases or subleases of other property in the ordinary course of business which do not materially interfere with the business of Holdings and the Restricted Subsidiaries;

(8)     the sale of Permitted Investments (other than sales of Equity Interests of any of the Restricted Subsidiaries) made by Holdings or any Restricted Subsidiary after the date of this Indenture, if such Permitted Investments were (a) received in exchange for, or purchased out of the net cash proceeds of the substantially concurrent sale (other than to a Subsidiary of Holdings) of, Equity Interests of Holdings (other than Disqualified Stock) or (b) received in the form of, or were purchased from the proceeds of, a substantially concurrent contribution of common equity capital to Holdings;

(9)     the sale of the capital stock of or any of the assets of, Gardeners Eden, Inc.

"Bankruptcy Law" means Title 11, U.S. Code or any similar federal or state law for the relief of debtors.

"Beneficial Owner" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time. The terms "Beneficially Owns" and "Beneficially Owned" have corresponding meanings.

"Board of Directors" means:

        (1)     with respect to a corporation, the board of directors of the corporation or, other than for purposes of the definition of "Change of Control" and "Continuing Directors," any committee thereof duly authorized to act on behalf of such board; and

        (2)     with respect to any other Person, the functional equivalent of a board of directors of a corporation or, other than for purposes of the definition of "Change of Control" and "Continuing Directors," any committee thereof duly authorized to act on behalf thereof.

"Borrowing Base" means "Borrowing Base" as defined in the Credit Agreement.

"Business Day" means any day other than a Legal Holiday.

"Capital Lease Obligation" means, at the time any determination is to be made, the amount of the liability in respect of a capital lease that would at that time be required to be capitalized on a balance sheet prepared in accordance with GAAP.

"Capital Stock" means:

        (1)     in the case of a corporation, corporate stock;

        (2)     in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

        (3)     in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

        (4)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"Cash Equivalents" means:

        (1)     United States dollars (including such dollars as are held as overnight bank deposits and demand deposits with banks);

        (2)     securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality of the United States government (provided that the full faith and credit of the United States is pledged in support of those securities) having maturities of not more than one year from the date of acquisition;

        (3)     certificates of deposit, time deposits, time deposit accounts, term deposit accounts, money market deposit accounts and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case, with any domestic commercial bank having capital and surplus in excess of $500.0 million and a Thomson Bank Watch Rating of "B" or better;

(4)     repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clauses (2) and (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above;

(5)     commercial paper having one of the two highest ratings obtainable from Moody's or S&P and, in each case, maturing within one year after the date of acquisition;

(6)     money market funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in clauses (1) through (5) of this definition; and

(7)     in the case of any Foreign Subsidiary, investments made locally of a type comparable to those described in clauses (1) through (6) of this definition.

"Change of Control" means the occurrence of any of the following:

(1)     the direct or indirect sale, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of Holdings and its Subsidiaries taken as a whole to any "person" (as that term is used in Section 13(d) of the Exchange Act) other than an Equity Sponsor or a Control Investment Affiliate of an Equity Sponsor;

(2)     the adoption of a plan relating to the liquidation or dissolution of Holdings or the Company (other than a transaction that complies with Section 5.01 hereof);

(3)     the consummation of any transaction (including, without limitation, any merger or consolidation), the result of which is that any "person" (as defined in clause (1) above) other than an Equity Sponsor or a Control Investment Affiliate of an Equity Sponsor becomes the Beneficial Owner, directly or indirectly, of Voting Stock of Holdings representing 50% or more of the total voting power of the Voting Stock of Holdings; provided that this clause (3) shall not be deemed to be triggered by any Person that is deemed to be a Beneficial Owner of Voting Stock of the Company by virtue of its relationship with (other than ownership directly or indirectly of Capital Stock of) an Equity Sponsor or a Control Investment Affiliate of an Equity Sponsor;

(4)     after an initial public offering of Holdings or any Parent Company, the first day on which a majority of the members of the Board of Directors of Holdings are not Continuing Directors; provided, however, that the Equity Sponsor and their Control Investment Affiliates do not, at such time, in the aggregate, (a) Beneficially Own, directly or indirectly, Voting Stock of Holdings representing more than 50% of the total voting power of the Voting Stock of Holdings or (b) have the right or ability by voting power, contract or otherwise to elect or designate a majority of the Board of Directors of Holdings; or

(5)     Holdings shall cease to Beneficially Own all of the Equity Interests of the Company.

"Class" means (1) in the case of Parity Lien Debt, every Series of Parity Lien Debt, taken together, and (2) in the case of Priority Lien Debt, every Series of Priority Lien Debt, taken together.

"Clearstream" means Clearstream Banking, S.A.

"Collateral" means all properties and assets at any time owned or acquired by the Company or any of the other Pledgors, except:

   (1)  Excluded Assets;

   (2)  any properties and assets in which the Collateral Agent is required to release its Liens pursuant to the provisions described in Section 5.1 of the Intercreditor Agreement;

   (3)  any properties and assets that no longer secure the Notes or any Obligations in respect thereof pursuant to the provisions described in Section 5.4 of the Intercreditor Agreement;

provided that, in the case of clauses (2) and (3), if such Liens are required to be released as a result of the sale, transfer or other disposition of any properties or assets of the Company or any other Pledgor, such assets or properties will cease to be excluded from the Collateral if the Company or any other Pledgor thereafter acquires or reacquires such assets or properties.

"Collateral Agent" means Wells Fargo Bank, N.A., in its capacity as collateral agent under the Security Documents, together with its successors in such capacity.

"Company" means Brookstone Company, Inc., a New Hampshire corporation.

"Consolidated Cash Flow" means, for any period, for any Person, an amount determined for such Person and its Restricted Subsidiaries on a consolidated basis equal to:

   (1)  Consolidated Net Income for such period plus

   (2)  the sum, without duplication, of the amounts for such Person and its Restricted Subsidiaries for such period (in each case to the extent reducing such Consolidated Net Income) of:

     (a)  Fixed Charges;

     (b)  provision for taxes based on income;

     (c)  total depreciation expenses;

     (d)  total amortization expenses;

     (e)  other non-cash items reducing such Consolidated Net Income (excluding any such non-cash item to the extent that it represents an accrual or reserve for potential cash items in any future period or amortization of a prepaid cash item that was paid in a prior period);

     (f)  costs and expenses incurred on or prior to the Issue Date in connection with the Transactions;

(g)    other non-recurring, non-operating losses in an aggregate amount not to exceed $2.5 million in any four-quarter period;

(h)    cash gains realized under Hedging Obligations relating to currency exchange rates; and

(i)    minority interest (if negative) with respect to any Subsidiary Guarantor; minus

(3)    the sum, without duplication, of the amounts for such period (in each case to the extent increasing such Consolidated Net Income) of

(a)    non-cash items increasing such Consolidated Net Income (excluding any such non-cash item to the extent it represents the reversal of an accrual or reserve for potential cash item in any prior period);

(b)    non-recurring, non-operating gains;

(c)    cash losses realized under Hedging Obligations relating to currency exchange rates; and

(d)    minority interest (if positive) with respect to any Subsidiary Guarantor;

provided that the items listed in clauses (2)(a) through (e) of a Restricted Subsidiary will be included in Consolidated Cash Flow only to the extent (and in the same proportion) that the net income of such Subsidiary was included in calculating Consolidated Net Income for such period.

"Consolidated Leverage Ratio" means, at any date of determination, the ratio of:

(a)    the aggregate Indebtedness of Issuer and its Restricted Subsidiaries on such date, less their unrestricted cash and Cash Equivalents, to

(b)    the Consolidated Cash Flow during the most recently-ended period of four fiscal quarters for which financial statements are available.

"Consolidated Net Income" means, for any period, the net income (or net loss) of a Person and its Restricted Subsidiaries for such period as determined on a consolidated basis in accordance with GAAP, adjusted to the extent included in calculating such net income or loss by excluding:

(1)    any net after-tax extraordinary gains or losses (less all fees and expenses relating thereto);

(2)    any net after-tax gains or losses (less all fees and expenses relating thereto) attributable to Asset Sales, dispositions of securities or returned surplus assets of any pension plan;

(3)     the net income (but not the net loss) of any Person that is not a Restricted Subsidiary or that is accounted for by the equity method of accounting, except to the extent of the amount of dividends or other distributions actually paid to Holdings or any Restricted Subsidiary in cash during such period;

(4)     the net income (but not the net loss) of any Restricted Subsidiary to the extent that the declaration or payment of dividends or similar distributions by such Restricted Subsidiary is at the date of determination prohibited, directly or indirectly, except to the extent that such net income is actually paid to Holdings or any Restricted Subsidiary by loans, advances, intercompany transfers, principal repayments or otherwise;

(5)     the cumulative effect of a change in accounting principles; and

(6)     income or gains resulting from the Transactions.

provided, further, that Consolidated Net Income shall be reduced by amounts under clause (1) of the definition of Permitted Payments to Parent.

"Continuing Directors" means, as of any date of determination, any member of the Board of Directors of Holdings who:

(1)     was a member of such Board of Directors on the Issue Date;

(2)     was nominated for election or elected to such Board of Directors with the approval of a majority of the Continuing Directors who were members of such Board of Directors at the time of such nomination or election; or

(3)     was nominated by one or more of the Equity Sponsors or their Control Investment Affiliates.

"Control Investment Affiliate" means, as to any Person, any Person which directly or indirectly is in control of, is controlled by, or is under common control with such Person and is organized by such Person (or any Person controlling such Person) primarily for making equity or debt investments in portfolio companies.

"Corporate Trust Office of the Trustee" will be at the address of the Trustee specified in Section 13.02 hereof or such other address as to which the Trustee may give notice to the Company.

"Credit Agreement" means that certain credit agreement, dated April 16, 2010, by and among Holdings, the Company, certain subsidiaries of the Company, Bank of America, N.A., General Electric Capital Corporation and the lenders from time to time party thereto, together with any agreements relating to the provision of cash and treasury management services and other bank products provided by a lender thereunder or an affiliate thereof and any related notes, guarantees, collateral documents, instruments and agreements executed in connection therewith, and in each case, as amended, restated, modified, renewed, refunded, replaced (whether upon termination or otherwise) or refinanced (including by means of sales of debt securities to institutional investors) in whole or in part from time to time.

"Credit Agreement Agent" means, at any time, the Person serving at such time as the "Agent" or "Administrative Agent" or "Collateral Agent" under the Credit Agreement or any other representative then most recently designated in accordance with the applicable provisions of the Credit Agreement, together with its successors in such capacity.

"Credit Facilities" means one or more debt facilities (including, without limitation, the Credit Agreement) or commercial paper facilities, in each case with banks or other institutional lenders providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from such lenders against such receivables) or letters of credit, in each case, as amended, restated, modified, renewed, refunded, replaced or refinanced (including by means of sales of debt securities to institutional investors) in whole or in part from time to time.

"Custodian" means the Trustee, as custodian with respect to the Notes in global form, or any successor entity thereto.

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"Definitive Note" means a certificated Note registered in the name of the Holder thereof and issued in accordance with Section 2.06 hereof, substantially in the form of Exhibit A1 hereto except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"Depositary" means, with respect to the Notes issuable or issued in whole or in part in global form, the Person specified in Section 2.03 hereof as the Depositary with respect to the Notes, and any and all successors thereto appointed as depositary hereunder and having become such pursuant to the applicable provision of this Indenture.

"Designated Preferred Stock" means preferred stock issued after the date of this Indenture (including, without limitation, Disqualified Stock) issued and sold for cash in a bona fide financing transaction that is designated as Designated Preferred Stock pursuant to an officers' certificate on the issuance date thereof, the net cash proceeds of which are excluded from the calculation set forth in clause (3) of the first paragraph of Section 4.07 hereof and are not used for purposes of clause (b) of the second paragraph thereof.

"Discharge of Priority Lien Obligations" means the occurrence of all of the following:

(1)     termination or expiration of all commitments to extend credit that would constitute Priority Lien Debt;

(2)     payment in full in cash of the principal of and interest and premium (if any) on all Priority Lien Debt (other than any undrawn letters of credit);

(3)     discharge or cash collateralization (at the lower of (a) 105% of the aggregate undrawn amount and (b) the percentage of the aggregate undrawn amount required for release of liens under the terms of the applicable Priority Lien Document) of all outstanding letters of credit constituting Priority Lien Debt; and

(4)     payment in full in cash of all other Priority Lien Obligations that are outstanding and unpaid at the time the Priority Lien Debt is paid in full in cash (other than any obligations for taxes, costs, indemnifications, reimbursements, damages and other liabilities in respect of which no claim or demand for payment has been made at such time).

"Disqualified Stock" means any Capital Stock that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder of the Capital Stock), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder of the Capital Stock, in whole or in part, on or prior to the date that is 91 days after the date on which the Notes mature.  Notwithstanding the preceding sentence, any Capital Stock that would constitute Disqualified Stock solely because the holders of the Capital Stock have the right to require the Company to repurchase such Capital Stock upon the occurrence of a change of control or an asset sale will not constitute Disqualified Stock if the asset sale or change or control provisions applicable to such Capital Stock provide that the Company may not repurchase or redeem any such Capital Stock pursuant to such provisions unless such repurchase or redemption complies with Section 4.07 hereof.  The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Indenture will be the maximum amount that Holdings and its Restricted Subsidiaries may become obligated to pay upon the maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock.

"Domestic Subsidiary" means any Restricted Subsidiary of Holdings that was formed under the laws of the United States or any state of the United States or the District of Columbia or that guarantees or otherwise provides direct credit support for any Indebtedness of Holdings or the Company.

"equally and ratably" means, in reference to sharing of Liens or proceeds thereof as between holders of Secured Obligations within the same Class, that such Liens or proceeds:

(1)     will be allocated and distributed first to the Secured Debt Representative for each outstanding Series of Secured Debt within that Class, for the account of the holders of such Series of Secured Debt, ratably in proportion to the principal of, and interest and premium (if any) and reimbursement obligations (contingent or otherwise) with respect to letters of credit, if any, outstanding (whether or not drawings have been made under such letters of credit) on each outstanding Series of Secured Debt within that Class when the allocation or distribution is made, and thereafter

(2)     will be allocated and distributed (if any remain after payment in full of all of the principal of, and interest and premium (if any) and reimbursement obligations (contingent or otherwise) with respect to letters of credit, if any, outstanding (whether or not drawings have been made on such letters of credit) on all outstanding Secured Obligations within that Class) to the Secured Debt Representative for each outstanding Series of Secured Obligations within that Class, for the account of the holders of any remaining Secured Obligations within that Class, ratably in proportion to the aggregate unpaid amount of such remaining Secured Obligations within that Class due and demanded (with written notice to the applicable Secured Debt Representative, the Priority Lien Collateral Agent and the Collateral Agent) prior to the date such distribution is made.

10

"Equity Interests" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"Equity Sponsors" means J.W. Childs Associates, L.P., OSIM International Ltd and Temasek Capital (Private) Limited.

"Euroclear" means Euroclear Bank, S.A./N.V., as operator of the Euroclear system.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Assets" means each of the following:

(1)     any permit, lease, license, contract, instrument or other agreement held by the Company or any other Pledgor that prohibits or requires the consent of any Person as a condition to the creation by the Company or such other Pledgor of a security interest or Lien thereon or that would be breached or give the other party the right to terminate it as a result thereof, or any permit, lease, license contract or other agreement held by the Company or any other Pledgor to the extent that any law applicable thereto prohibits the creation of a security interest or Lien thereon or that would be breached or give the other party the right to terminate is as a result thereof, but only, in each case to the extent, and for so long as, such prohibition is not terminated or rendered unenforceable or otherwise deemed ineffective by the UCC (including Sections 9-406(a), 9-407(a), 9-408(a) and 9-409 of the UCC) or any other law, and (ii) equipment owned by the Company or any other Pledgor that is subject to a purchase money Lien or a capital lease which is permitted by this Indenture if the contract or other agreement in which such Lien is granted (or in the documentation providing for such capital lease) prohibits or requires the consent of any Person as a condition to the creation of any other Lien on such equipment or that would be breached or give the other party the right to terminate is as a result thereof provided, however, "Excluded Assets" shall not include any Proceeds, substitutions or replacements of Excluded Assets (unless such Proceeds, substitutions or replacements would constitute replacements of Excluded Assets);

(2)     any interest of the Company or any other Pledgor in any real property;

(3)     all "securities" of the Company or any of the Company's "affiliates" (as the terms "securities" and "affiliates" are used in Rule 3-16 of Regulation S-X under the Securities Act); and

(4)     any other property or assets in which a Lien cannot be perfected by the filing of a financing statement under the Uniform Commercial Code of the relevant jurisdiction, so long as the aggregate Fair Market Value of all such property and assets does not at any one time exceed $10.0 million.

"Existing Indebtedness" means Indebtedness of the Company and its Subsidiaries (other than Indebtedness under the Credit Agreement) in existence on the date of this Indenture after giving effect to the cancellation of Old Notes as a result of the Transactions, the issuance of the Notes and the borrowing under the Credit Agreement on the Issue Date and the use of proceeds therefrom, until such amounts are repaid.

11

"Fair Market Value" means the value that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving distress or necessity of either party, determined in good faith by the Board of Directors of the Company.

"Fixed Charge Coverage Ratio" means, with respect to any specified Person for any period, the ratio of the Consolidated Cash Flow of such Person for such period to the Fixed Charges of such Person for such period. In the event that the specified Person or any Restricted Subsidiary incurs, assumes, guarantees, repays, repurchases, redeems, defeases or otherwise discharges any Indebtedness (other than ordinary working capital borrowings) or issues, repurchases or redeems preferred stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated and on or prior to the date on which the event for which the calculation of the Fixed Charge Coverage Ratio is made occurred (the "Calculation Date"), then the Fixed Charge Coverage Ratio will be calculated giving pro forma effect to such incurrence, assumption, guarantee, repayment, repurchase, redemption, defeasance or other discharge of Indebtedness, or such issuance, repurchase or redemption of preferred stock, and the use of the proceeds therefrom, as if the same had occurred at the beginning of the applicable four-quarter reference period.

In addition, for purposes of calculating the Fixed Charge Coverage Ratio:

(1)     acquisitions that have been made by the specified Person or any Restricted Subsidiary, including through mergers or consolidations, or any Person or any Restricted Subsidiary acquired by the specified Person or any Restricted Subsidiary, and including any related financing transactions and including increases in ownership of Restricted Subsidiaries, during the four-quarter reference period or subsequent to such reference period and on or prior to the Calculation Date will be given pro forma effect (in accordance with Regulation S-X under the Securities Act but giving effect to Pro Forma Cost Savings) as if they had occurred on the first day of the four-quarter reference period;

(2)     the Consolidated Cash Flow attributable to operations or businesses (and ownership interests therein) disposed of prior to the Calculation Date will be excluded;

(3)     the Fixed Charges attributable to operations or businesses (and ownership interests therein) disposed of prior to the Calculation Date will be excluded, but only to the extent that the obligations giving rise to such Fixed Charges will not be obligations of the specified Person or any Restricted Subsidiary following the Calculation Date;

(4)     any Person that is a Restricted Subsidiary on the Calculation Date (or would become a Restricted Subsidiary on such Calculation Date in connection with the transaction requiring determination of such Consolidated Cash Flow) will be deemed to have been a Restricted Subsidiary at all times during such four-quarter period;

(5)     any Person that is not a Restricted Subsidiary on the Calculation Date (or would cease to be a Restricted Subsidiary on such Calculation Date in connection with the transaction requiring determination of such Consolidated Cash Flow) will be deemed not to have been a Restricted Subsidiary at any time during such four-quarter period; and

12

(6)     if any Indebtedness bears a floating rate of interest, the interest expense on such Indebtedness will be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligation applicable to such Indebtedness if such Hedging Obligation has a remaining term as at the Calculation Date in excess of 12 months).

"Fixed Charges" means, with respect to any specified Person for any period, the sum, without duplication, of:

(1)     the consolidated interest expense of such Person and its Restricted Subsidiaries for such period, whether paid or accrued, including, without limitation, amortization of debt issuance costs and original issue discount, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments associated with Capital Lease Obligations, commissions, discounts and other fees and charges incurred in respect of letter of credit or bankers' acceptance financings, and net of the effect of all payments made or received pursuant to Hedging Obligations in respect of interest rates; plus

(2)     the consolidated interest of such Person and its Restricted Subsidiaries that was capitalized during such period; plus

(3)     any interest accruing on Indebtedness of another Person that is guaranteed by such Person or one of its Restricted Subsidiaries or secured by a Lien on assets of such Person or one of its Restricted Subsidiaries, whether or not such guarantee or Lien is called upon; plus

(4)     the product of (a) all dividends, whether paid or accrued and whether or not in cash, on any series of preferred stock of such Person or any Restricted Subsidiary, other than dividends on Equity Interests payable solely in Equity Interests of the Company (other than Disqualified Stock) or to the Company or a Restricted Subsidiary of the Company, times (b) a fraction, the numerator of which is one and the denominator of which is one minus the then current combined federal, state and local statutory tax rate of such Person, expressed as a decimal, in each case, on a consolidated basis and in accordance with GAAP.

"Foreign Subsidiary" means any Subsidiary of Holdings that is not a Domestic Subsidiary.

"GAAP" means generally accepted accounting principles in the United States of America, as set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect from time to time.

"Global Note Legend" means the legend set forth in Section 2.06(g)(2) hereof, which is required to be placed on all Global Notes issued under this Indenture.

"Global Notes" means, individually and collectively, each of the Restricted Global Notes and the Unrestricted Global Notes deposited with or on behalf of and registered in the name of the Depositary or its nominee, substantially in the form of Exhibit A1 hereto and that bears the

Global Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, issued in accordance with Section 2.01, 2.06(b)(3), 2.06(b)(4), 2.06(d)(2) or 2.06(f) hereof.

"Government Securities" means direct obligations of, or obligations guaranteed by, the United States of America, and the payment for which the United States pledges its full faith and credit.

"guarantee" means a guarantee other than by endorsement of negotiable instruments for collection in the ordinary course of business, direct or indirect, in any manner, including, without limitation, by way of a pledge of assets or through letters of credit or reimbursement agreements in respect thereof, of all or any part of any Indebtedness (whether arising by virtue of partnership arrangements, or by agreements to keep well, to purchase assets, goods, securities or services, to take or pay or to maintain financial statement conditions or otherwise).

"Guarantors" means Holdings and the Subsidiary Guarantors.

"Hedging Obligations" of any Person means the obligations of such Person under swap, cap, collar, forward purchase or similar agreements or arrangements dealing with interest rates, currency exchange rates or commodity prices, either generally or under specific contingencies.

"Holder" means a Person in whose name a Note is registered.

"Holdings" means Brookstone, Inc., a Delaware corporation.

"Indebtedness" means, with respect to any specified Person, any indebtedness of such Person (excluding accrued expenses and trade payables), whether or not contingent:

        (1)      in respect of borrowed money;

        (2)      evidenced by bonds, notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof);

        (3)      in respect of bankers' acceptances;

        (4)      representing Capital Lease Obligations;

        (5)      representing the balance deferred and unpaid of the purchase price of any property or services due more than six months after such property is acquired or such services are completed, except any such balance that represents an accrued expense or trade payable;

        (6)      representing any Hedging Obligations; or

        (7)      all monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise of Holdings or any Restricted Subsidiary arising out of any cash management, depository or investment services provided by any Priority Lien Collateral Agent or its Affiliates.

if and to the extent any of the preceding items (other than letters of credit, Hedging Obligations and obligations referred to in clause (7) above) would appear as a liability upon a balance sheet of the specified Person prepared in accordance with GAAP. In addition, the term "Indebtedness" includes all Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person), but only to the extent that the aggregate amount of such Indebtedness does not exceed the Fair Market Value of the asset, and, to the extent not otherwise included, the guarantee by the specified Person of any Indebtedness of any other Person. In no event will obligations or liabilities in respect of any Capital Stock constitute Indebtedness hereunder.

"Indenture" means this Indenture, as amended or supplemented from time to time.

"Indirect Participant" means a Person who holds a beneficial interest in a Global Note through a Participant.

"Initial Notes" means the first $125,612,000 aggregate principal amount of Notes issued under this Indenture on the date hereof.

"insolvency or liquidation proceeding" means:

(1)    any case commenced by or against the Company or any other Pledgor under Title 11, U.S. Code or any similar federal or state law for the relief of debtors, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of the Company or any other Pledgor, any receivership or assignment for the benefit of creditors relating to the Company or any other Pledgor or any similar case or proceeding relative to the Company or any other Pledgor or its creditors, as such, in each case whether or not voluntary;

(2)    any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to the Company or any other Pledgor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or

(3)    any other proceeding of any type or nature in which substantially all claims of creditors of the Company or any other Pledgor are determined and any payment or distribution is or may be made on account of such claims.

"Intercreditor Agreement" means the Intercreditor Agreement, dated as of the date hereof, among the Pledgors, the Credit Agreement Agent, the Trustee and the Collateral Agent, as amended, supplemented or otherwise modified from time to time.

"Investments" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the forms of loans (including guarantees or other obligations), advances or capital contributions, purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP. If Holdings or any Restricted Subsidiary sells or otherwise disposes of any Equity Interests of any Restricted Subsidiary such that, after giving effect to any such sale or disposition, such Person is no longer a Restricted Subsidiary, Holdings will be deemed to have made an Investment on the

date of any such sale or disposition equal to the Fair Market Value of Holdings' Investments in such Restricted Subsidiary that were not sold or disposed of in an amount determined as provided in the final paragraph of Section 4.07 hereof. The acquisition by Holdings or any Restricted Subsidiary of a Person that holds an Investment in a third Person will be deemed to be an Investment by Holdings or such Restricted Subsidiary in such third Person in an amount equal to the Fair Market Value of the Investments held by the acquired Person in such third Person in an amount determined as provided in the final paragraph of Section 4.07 hereof. Except as otherwise provided in this Indenture, the amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value. Notwithstanding the foregoing, Restricted Payments of the type described in clause (iii) of the definition thereof will not be deemed to be Investments.

"Issue Date" means the date on which the Notes are first issued under this Indenture.

"Legal Holiday" means a Saturday, a Sunday or a day on which banking institutions in the City of New York or at a place of payment are authorized by law, regulation or executive order to remain closed. If a payment date is a Legal Holiday at a place of payment, payment may be made at that place on the next succeeding day that is not a Legal Holiday, and no interest shall accrue on such payment for the intervening period.

"letters of credit" means "Letters of Credit" as defined in the Credit Agreement.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest, hypothec or encumbrance of any kind in respect of such asset, whether or not filed, recorded, registered or otherwise perfected under applicable law, including any conditional sale or other title retention agreement; provided that in no event shall an operating lease that is not a Capital Lease Obligation be deemed to constitute a Lien.

"Lien Sharing and Priority Confirmation" means:

(1)     as to any Series of Parity Lien Debt, the written agreement of the holders of such Series of Parity Lien Debt, as set forth in this Indenture, the Credit Agreement or other agreement governing such Series of Parity Lien Debt, for the enforceable benefit of all holders of each existing and future Series of Priority Lien Debt, each existing and future Priority Lien Representative and each existing and future holder of Permitted Prior Liens:

(a)     that all Parity Lien Obligations will be and are secured equally and ratably by all Parity Liens at any time granted by the Company or any other Pledgor to secure any Obligations in respect of such Series of Parity Lien Debt, whether or not upon property otherwise constituting collateral for such Series of Parity Lien Debt, and that all such Parity Liens will be enforceable by the Collateral Agent for the benefit of all holders of Parity Lien Obligations equally and ratably;

(b)     that the holders of Obligations in respect of such Series of Parity Lien Debt are bound by the provisions of the Intercreditor Agreement, including the provisions relating to the ranking of Parity Liens and the order of application of proceeds from the enforcement of Parity Liens; and

(c)     consenting to and directing the Collateral Agent to perform its obligations under the Intercreditor Agreement and the other Security Documents; and

(2)     as to any Series of Priority Lien Debt, the written agreement of the holders of such Series of Priority Lien Debt, as set forth in the Credit Agreement or other agreement governing such Series of Priority Lien Debt, for the enforceable benefit of all holders of each existing and future Series of Parity Lien Debt, each existing and future Parity Lien Representative and each existing and future holder of Permitted Prior Liens:

(a)     that all Priority Lien Obligations will be and are secured equally and ratably by all Priority Liens at any time granted by the Company or any other Pledgor to secure any Obligations in respect of such Series of Priority Lien Debt, whether or not upon property otherwise constituting Collateral for such Series of Priority Lien Debt, and that all such Priority Liens will be enforceable by the Priority Lien Collateral Agent for the benefit of all holders of Priority Lien Obligations equally and ratably;

(b)     that the holders of Obligations in respect of such Series of Priority Lien Debt are bound by the provisions of the Intercreditor Agreement, including the provisions relating to the ranking of Priority Liens and the order of application of proceeds from enforcement of Priority Liens; and

(c)     consenting to and directing the Priority Lien Collateral Agent to perform its obligations under the Intercreditor Agreement and the other Security Documents.

"Net Proceeds" means the aggregate cash proceeds received by Holdings or any Restricted Subsidiary in respect of any Asset Sale (including, without limitation, any cash received upon the sale or other disposition of any non-cash consideration received in any Asset Sale), net of the direct costs relating to such Asset Sale, including, without limitation, (a) fees and expenses related to such Asset Sale (including legal, accounting and investment banking fees and discounts, and sales and brokerage commissions, and any relocation expenses incurred as a result of the Asset Sale), (b) taxes paid or payable as a result of the Asset Sale, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements, (c) amounts required to be applied to the repayment of Indebtedness, other than Indebtedness under a Credit Facility, secured by a Lien on the asset or assets that were the subject of such Asset Sale, (d) any reserve in accordance with GAAP against any liabilities associated with such Asset Sale and retained by the seller after such Asset Sale, including pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale and (e) cash escrows (until released from escrow to the seller).

"Non-Recourse Debt" means Indebtedness:

(1)     as to which neither Holdings nor any Restricted Subsidiary (a) provides credit support of any kind (including any undertaking, agreement or instrument that would constitute Indebtedness), (b) is directly or indirectly liable as a guarantor or otherwise, or (c) constitutes the lender;

(2)      no default with respect to which would permit upon notice, lapse of time or both any holder of any Indebtedness of Holdings or any Restricted Subsidiary to declare a default on such Indebtedness or cause the payment of the Indebtedness to be accelerated or payable prior to its Stated Maturity; and

(3)      as to which the lenders have been notified in writing that they will not have any recourse to the stock or assets of Holdings or any Restricted Subsidiary.

"Non-U.S. Person" means a Person who is not a U.S. Person.

"Note Documents" means this Indenture, the Notes, the Note Guarantees and the Security Documents.

"Note Guarantee" means the guarantee by each Guarantor of the Company's obligations under this Indenture and on the Notes, executed pursuant to the provisions of this Indenture.

"Notes" has the meaning assigned to it in the preamble to this Indenture.  The Initial Notes and the Additional Notes shall be treated as a single class for all purposes under this Indenture, and unless the context otherwise requires, all references to the Notes shall include the Initial Notes and any Additional Notes.

"Obligations" means any principal (including reimbursement obligations with respect to letters of credit whether or not drawn), interest (including, to the extent legally permitted, all interest accrued thereon after the commencement of any insolvency or liquidation proceeding at the rate, including any applicable post-default rate, specified in the Secured Debt Documents, even if such interest is not enforceable, allowable or allowed as a claim in such proceeding), premium (if any), fees, indemnifications, reimbursements, expenses and other liabilities payable under the applicable Secured Debt Documents.

"Officer" means, with respect to any Person, the Chairman of the Board, the Chief Executive Officer, the President, the Chief Operating Officer, the Chief Financial Officer, the Treasurer, any Assistant Treasurer, the Controller, the Secretary or any Vice-President of such Person.

"Officers' Certificate" means a certificate signed on behalf of the Company by two Officers of the Company, one of whom must be the principal executive officer, the principal financial officer or the principal accounting officer of the Company, that meets the requirements of Section 13.05 hereof.

"Old Notes" means the Company's 12% Second Lien Senior Secured Notes due 2012.

"Opinion of Counsel" means an opinion from legal counsel who is reasonably acceptable to the Trustee, that meets the requirements of Section 13.05 hereof.  The counsel may be an employee of or counsel to the Company, any Subsidiary of the Company or the Trustee.

"Parent Companies" means OSIM Brookstone Holdings, Inc., OSIM Brookstone Holdings, L.P., and any of its Subsidiaries that directly or indirectly owns Equity Interests of Holdings.

"Parity Lien" means a Lien granted by a Security Document to the Collateral Agent, at any time, upon any property of the Company or any other Pledgor to secure Parity Lien Obligations.

"Parity Lien Debt" means:

      (1)      the Notes issued on the date hereof; and

      (2)      any other Indebtedness of the Company (including Additional Notes) that is secured equally and ratably with the Notes by a Parity Lien that was permitted to be incurred and so secured under each applicable Secured Debt Document; provided that:

      (a)      the net proceeds are used to refund, refinance, replace, defease, discharge or otherwise acquire or retire Priority Lien Debt and corresponding permanent reduction in commitments or other Parity Lien Debt; or

      (b)      on the date of incurrence of such Indebtedness, after giving pro forma effect to the incurrence thereof and the application of the proceeds therefrom, the Secured Leverage Ratio would not be greater than 2.75 to 1.0;

provided, further, in the case of any Indebtedness referred to in clause (2) of this definition:

      (a)      on or before the date on which such Indebtedness is incurred by the Company, such Indebtedness is designated by the Company, in an officers' certificate delivered to each Parity Lien Representative and the Collateral Agent and the Priority Lien Collateral Agent, as "Parity Lien Debt" for the purposes of this Indenture and the Intercreditor Agreement; provided that no Series of Secured Debt may be designated as both Parity Lien Debt and Priority Lien Debt;

      (b)      such Indebtedness is governed by an indenture, credit agreement or other agreement that includes a Lien Sharing and Priority Confirmation; and

      (c)      all requirements set forth in the Intercreditor Agreement as to the confirmation, grant or perfection of the Collateral Agent's Liens to secure such Indebtedness or Obligations in respect thereof are satisfied (and the satisfaction of such requirements and the other provisions of this clause (c) will be conclusively established if the Company delivers to the Priority Lien Collateral Agent and the Collateral Agent an officers' certificate stating that such requirements and other provisions have been satisfied and that such Indebtedness is "Parity Lien Debt").

"Parity Lien Documents" means, collectively, the Note Documents and the indenture, credit agreement or other agreement governing each other Series of Parity Lien Debt and the Security Documents (other than any Security Documents that do not secure Parity Lien Obligations).

"Parity Lien Obligations" means Parity Lien Debt and all other Obligations in respect thereof.

"Parity Lien Representative" means:

(1)     in the case of the Notes, the Trustee; or

(2)     in the case of any other Series of Parity Debt, the trustee, agent or representative of the Holders of such Series of Parity Debt who maintains the transfer register for such Series of Parity Lien Debt and (a) is appointed as a Parity Lien Representative (for purposes related to the administration of the Security Documents) pursuant to the indenture, credit agreement or other agreement governing such Series of Parity Lien Debt, together with its successors in such capacity, and (b) has become a party to the Intercreditor Agreement by executing a joinder in the form required under the Intercreditor Agreement.

"Participant" means, with respect to the Depositary, Euroclear or Clearstream, a Person who has an account with the Depositary, Euroclear or Clearstream, respectively (and, with respect to DTC, shall include Euroclear and Clearstream).

"Permitted Business" means any business conducted by Holdings or any Restricted Subsidiary on the Issue Date and any businesses that, in the good faith judgment of the Board of Directors of Holdings, are reasonably related, ancillary or complementary thereto, or reasonable extensions thereof.

"Permitted Investments" means:

(1)     any Investment in Cash Equivalents;

(2)     any Investment in Holdings or in a Restricted Subsidiary;

(3)     any Investment by Holdings or any Restricted Subsidiary in a Person, if as a result of such Investment:

(a)     such Person becomes a Restricted Subsidiary; or

(b)     such Person is merged or consolidated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, Holdings or a Restricted Subsidiary;

(4)     any Investment made as a result of the receipt of non-cash consideration from an Asset Sale that was made pursuant to and in compliance with Section 4.10 hereof;

(5)     any Investment made for consideration consisting of Qualified Equity Interests;

(6)     any Investment received in compromise or resolution of (A) obligations of trade creditors or customers that were incurred in the ordinary course of business of Holdings or any Restricted Subsidiary, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer; or (B) litigation, arbitration or other disputes with Persons that are not Affiliates;

(7)     Investments represented by Hedging Obligations permitted under this Indenture;

(8)     loans or advances to employees of Holdings or any of its Subsidiaries (x) in the ordinary course of business in an aggregate amount not to exceed $5.0 million at any time outstanding or (y) in connection with the purchase by such Persons of Equity Interests of Holdings or any Parent Company so long as the cash proceeds of such purchase received by any Parent Company are contemporaneously contributed to the common equity capital of Holdings;

(9)     Investments in existence on the Issue Date;

(10)     Investments in prepaid expenses, negotiable instruments held for collection and lease, endorsements for deposit or collection in the ordinary course of business, utility or workers compensation, performance and similar deposits entered into as a result of the operations of the business in the ordinary course of business;

(11)     pledges or deposits permitted under clause (6) of the definition of Permitted Liens;

(12)     receivables owing to Holdings or any Restricted Subsidiary if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms as Holdings or such Restricted Subsidiary deems reasonable under the circumstances; and

(13)     other Investments in any Person having an aggregate Fair Market Value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), when taken together with all other Investments made pursuant to this clause (13) that are at the time outstanding (net of the amount of all returns of principal or capital received in cash or Cash Equivalents with respect to such Investments), not to exceed $15.0 million.

"Permitted Liens" means:

(1)     Liens held by the Priority Lien Collateral Agent securing Priority Lien Debt in an aggregate principal amount not exceeding the Priority Lien Cap and all Obligations related thereto;

(2)     Liens held by the Collateral Agent equally and ratably securing the Notes to be issued on the date hereof and all future Parity Lien Debt and other Parity Lien Obligations;

(3)     Liens in favor of Holdings or any Restricted Subsidiary;

(4)     Liens on property (including Capital Stock) of a Person existing at the time such Person is merged with or into or consolidated with Holdings or any Subsidiary of Holdings; provided that such Liens were in existence prior to the contemplation of such merger or consolidation and do not extend to any assets other than those of the Person merged into or consolidated with Holdings or the Subsidiary;

21

(5)    Liens on property (including Capital Stock) existing at the time of acquisition of the property by Holdings or any Subsidiary of Holdings; provided that such Liens were in existence prior to, such acquisition, and not incurred in contemplation of, such acquisition;

(6)    Liens to secure the performance of statutory obligations, surety or appeal bonds, performance bonds or other obligations of a like nature incurred in the ordinary course of business;

(7)    Liens to secure Indebtedness (including Capital Lease Obligations) permitted by clause (4) of the second paragraph of Section 4.09 hereof covering only the assets acquired with or financed by such Indebtedness;

(8)    Liens existing on the date of this Indenture;

(9)    Liens for taxes, assessments or governmental charges or claims that are not yet delinquent more than 30 days or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; provided that any reserve or other appropriate provision as is required in conformity with GAAP has been made therefor;

(10)    Liens imposed by law, such as carriers', warehousemen's, landlords', suppliers' and mechanics' Liens, in each case, incurred in the ordinary course of business;

(11)    survey exceptions, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real property that were not incurred in connection with Indebtedness and that do not in the aggregate materially adversely affect the operation of the business of the Company and its Restricted Subsidiaries, taken as a whole;

(12)    Liens created for the benefit of (or to secure) the Notes (or the Note Guarantees) or payment obligations to the Trustee;

(13)    Liens to secure any Permitted Refinancing Indebtedness permitted to be incurred under this Indenture; provided, however, that the new Lien shall be limited to all or part of the same property and assets that secured or, under the written agreements pursuant to which the original Lien arose, could secure the original Lien (plus improvements and accessions to such property or proceeds or distributions thereof); and

(14)    Liens not otherwise permitted under this Indenture; provided that the aggregate amount of obligations secured thereby does not exceed $5.0 million at any one time outstanding;

(15)    judgment Liens not giving rise to an Event of Default;

(16)    Liens and rights of setoff in favor of a bank imposed by law and incurred in the ordinary course of business on deposit accounts maintained with such bank and cash and Cash Equivalents in such accounts;

22

(17)    Liens upon specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(18)    pledges or deposits by a Person under worker's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case incurred in the ordinary course of business;

(19)    Liens solely on any cash earnest money deposits in connection with any letter of intent or purchase agreement hereunder;

(20)    Liens in favor of customs revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(21)    any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;

(22)    Liens of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection;

(23)    Liens deemed to exist in connection with Investments in repurchase agreements permitted under this Indenture;

(24)    Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto to the extent permitted hereunder;

(25)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

(26)    purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the ordinary course of business; and

(27)    non-exclusive licenses of patents, trademarks and other intellectual property rights granted by Brookstone Company, Inc. or any of its Subsidiaries in the ordinary course of business and not interfering in any respect with the ordinary conduct of the business of Brookstone Inc. and its Subsidiaries, taken as a whole.

"Permitted Payments to Parent" means, without duplication as to amounts:

(1)    payments by Holdings to or on behalf of any Parent Company in an amount sufficient to pay out-of-pocket legal, accounting and filing and other general corporate overhead costs of such Parent Company and franchise taxes and other fees required to maintain its existence actually incurred by such Parent Company, in any case in an aggregate amount not to exceed $2.0 million in any calendar year; and

23

(2)     for so long as Company or Holdings is a member of a group filing a consolidated or combined tax return with any Parent Company, payments to the Parent Company in respect of an allocable portion of the tax liabilities of such group that is attributable to Holdings and its Subsidiaries ("Tax Payments"); the Tax Payments shall not exceed the lesser of (i) the amount of the relevant tax (including any penalties and interest) that Holdings or Company would owe if Holdings or Company were filing a separate tax return (or a separate consolidated or combined return with its Subsidiaries that are members of the consolidated or combined group), taking into account any carryovers and carrybacks of tax attributes (such as net operating losses) of Holdings or Company and such Subsidiaries from other taxable years and (ii) the net amount of the relevant tax that the Parent Company actually owes to the appropriate taxing authority; any Tax Payments received from Holdings or Company shall be paid over to the appropriate taxing authority within 30 days of the Parent Company's receipt of such Tax Payments or refunded to Holdings or Company, as appropriate.

"Permitted Prior Liens" means:

(1)     Liens described in clause (1) of the definition of "Permitted Liens;"

(2)     Liens described in clauses (4), (5), (7), (8), (17), (18), (19), (22), (23), (24), (25) and (27) of the definition of "Permitted Liens;"

(3)     Liens described in clause (13) of the definition of "Permitted Liens" to the extent the Lien securing the Indebtedness being refinanced constituted a Permitted Prior Lien under clause (1) or (2) of this definition; and

(4)     Permitted Liens that arise by operation of law and are not voluntarily granted, to the extent entitled by law to priority over the Liens created by the Priority Lien Security Documents or the Security Documents.

"Permitted Refinancing Indebtedness" means any Indebtedness of Holdings or any Restricted Subsidiary issued in exchange for, or the net proceeds of which are used to refund, refinance, replace, defease or discharge, other Indebtedness of Holdings or any Restricted Subsidiary; provided that:

(1)     the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness extended, refinanced, renewed, replaced, defeased or refunded (plus all accrued interest on the Indebtedness and the amount of all expenses and premiums incurred in connection therewith);

(2)     such Permitted Refinancing Indebtedness has a final maturity date not earlier than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded;

(3)     if the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded is subordinated in right of payment to the Notes, such Permitted Refinancing Indebtedness is subordinated in right of payment to, the Notes on terms at least as

favorable to the Holders of Notes as those contained in the documentation governing the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded; and

(4)    such Indebtedness is incurred either by Holdings or by the Restricted Subsidiary that is the obligor on the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity.

"Pledgors" means Holdings, the Company, the Guarantors and any other Person (if any) that provides collateral security for any Secured Obligations.

"Priority Lien" means a Lien granted by a Priority Lien Security Document to the Priority Lien Collateral Agent, at any time, upon any property of the Company or any other Pledgor to secure Priority Lien Obligations.

"Priority Lien Cap" means, as of any date, the principal amount outstanding under the Credit Agreement and/or the Indebtedness outstanding under any other Credit Facility, in an aggregate principal amount (including face amounts of letters of credit) not to exceed the sum of the amount provided by clause (1) of the definition of Permitted Debt, as of any date, plus the amount provided by clauses (13) and (14) of the definition of Permitted Debt, less the amount of Parity Lien Debt incurred after the date hereof the net proceeds of which are used to repay Priority Lien Debt and corresponding permanent reduction in commitments. For purposes of this definition, all letters of credit will be valued at the face amount thereof, whether or not drawn and all Hedging Obligations will be valued at zero.

"Priority Lien Collateral Agent" means the Credit Agreement Agent until such time as the Credit Agreement is no longer outstanding, thereafter shall mean such person as shall be appointed collateral agent under the Priority Lien Security Documents, together with its successors in such capacity.

"Priority Lien Debt" means:

(1)    Indebtedness of the Company under the Credit Agreement that was permitted to be incurred and secured under each applicable Secured Debt Document (or as to which the lenders under the Credit Agreement obtained an officers' certificate at the time of incurrence to the effect that such Indebtedness was permitted to be incurred and secured by all applicable Secured Debt Documents);

(2)    Indebtedness of the Company under any other Credit Facility that is secured equally and ratably with the Credit Agreement by a Priority Lien that was permitted to be incurred and so secured under each applicable Secured Debt Document; provided, in the case of any Indebtedness referred to in this clause (2), that:

(a)    on or before the date on which such Indebtedness is incurred by the Company, such Indebtedness is designated by the Company, in an officers' certificate delivered

to each Priority Lien Representative, the Priority Lien Collateral Agent and the Collateral Agent, as "Priority Lien Debt" for the purposes of the Secured Debt Documents; provided that no Series of Secured Debt may be designated as both Parity Lien Debt and Priority Lien Debt;

(b)     such Indebtedness is governed by a credit agreement or other agreement that includes a Lien Sharing and Priority Confirmation; and

(c)     all requirements set forth in the Intercreditor Agreement as to the confirmation, grant or perfection of the Priority Lien Collateral Agent's Lien to secure such Indebtedness or Obligations in respect thereof are satisfied (and the satisfaction of such requirements and the other provisions of this clause (c) will be conclusively established if the Company delivers to the Priority Lien Collateral Agent and the Collateral Agent an officers' certificate stating that such requirements and other provisions have been satisfied and that such Indebtedness is "Priority Lien Debt"); and

(3)     Hedging Obligations of the Company incurred to hedge or manage interest rate risk with respect to Priority Lien Debt; provided that:

(a)     such Hedging Obligations are secured by a Priority Lien on all of the assets and properties that secure Indebtedness under the Credit Facility in respect of which such Hedging Obligations are incurred; and

(b)     such Priority Lien is senior to or on a parity with the Priority Liens securing Indebtedness under the Credit Facility in respect of which such Hedging Obligations are incurred.

(4)     Notwithstanding the foregoing, if the sum of: (1) Indebtedness constituting principal outstanding under the Priority Lien Documents; plus (2) the aggregate face amount of any letters of credit issued but not reimbursed under the Priority Lien Documents, is in excess of Priority Lien Cap, then only that portion of such Indebtedness and such aggregate face amount of letters of credit equal to the Priority Lien Cap shall be included in Priority Lien Obligations and interest with respect to such Indebtedness and reimbursement obligations with respect to such letters of credit shall only constitute Priority Lien Obligations to the extent related to Indebtedness and face amounts of letters of credit included in the Priority Lien Obligations.

"Priority Lien Documents" means the Credit Agreement and any other Credit Facility pursuant to which any Priority Lien Debt is incurred and the Priority Lien Security Documents.

"Priority Lien Obligations" means the Priority Lien Debt and all other Obligations in respect of Priority Lien Debt.

"Priority Lien Representative" means the Credit Agreement Agent so long as the Credit Agreement is outstanding and thereafter, in the case of any other Series of Priority Lien Debt, the trustee, agent or representative of the holders of such Series of Priority Lien Debt who maintains the transfer register for such Series of Priority Lien Debt and is appointed as a representative of the Priority Debt (for purposes related to the administration of the Security Documents) pursuant to the Credit Agreement or other agreement governing such Series of Priority Lien Debt.

"Priority Lien Security Documents" means the Intercreditor Agreement, each Lien Sharing and Priority Confirmation, and all security agreements, pledge agreements, collateral assignments, mortgages, deeds of trust, collateral agency agreements, control agreements or other grants or transfers for security executed and delivered by the Company or any other Pledgor creating (or purporting to create) a Priority Lien upon Collateral in favor of the Priority Lien Collateral Agent, in each case, as amended, modified, renewed, restated or replaced, in whole or in part, from time to time, in accordance with its terms.

"Private Placement Legend" means the legend set forth in Section 2.06(g)(1) hereof to be placed on all Notes issued under this Indenture except where otherwise permitted by the provisions of this Indenture.

"Pro Forma Cost Savings" means, with respect to any period, the reductions in costs that occurred during the four-quarter period that are (1) directly attributable to an asset acquisition and calculated on a basis that is consistent with Article 11 of Regulation S-X under the Securities Act or (2) implemented, committed to be implemented or the commencement of implementation of which was begun in good faith by the business that was the subject of any such asset acquisition within six months of the date of the asset acquisition and that are supportable and quantifiable by the underlying records of such business, as if, in the case of each of clauses (1) and (2), all such reductions in costs had been effected as of the beginning of such period, decreased by any incremental expenses incurred or to be incurred during the four-quarter period in order to achieve such reduction in costs.

"Public Equity Offering" means an offer and sale of Capital Stock (other than Disqualified Stock) of the Company, Holdings or any Parent Company pursuant to a registration statement that has been declared effective by the SEC pursuant to the Securities Act (other than a registration statement on Form S-8 or otherwise relating to equity securities issuable under any employee benefit plan of Holdings).

"QIB" means a "qualified institutional buyer" as defined in Rule 144A.

"Qualified Equity Interests" means Equity Interests of Holdings other than Disqualified Stock.

"Regulation S" means Regulation S promulgated under the Securities Act.

"Regulation S Global Note" means a Regulation S Temporary Global Note or Regulation S Permanent Global Note, as appropriate.

"Regulation S Permanent Global Note" means a permanent Global Note in the form of Exhibit A1 hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of and registered in the name of the Depositary or its nominee, issued in a denomination equal to the outstanding principal amount of the Regulation S Temporary Global Note upon expiration of the Restricted Period.

"Regulation S Temporary Global Note" means a temporary Global Note in the form of Exhibit A2 hereto deposited with or on behalf of and registered in the name of the Depositary or

its nominee, issued in a denomination equal to the outstanding principal amount of the Notes initially sold in reliance on Rule 903 of Regulation S.

"Required Parity Lien Debtholders" means, at any time, the holders of more than 50% of the sum of:

        (a)     the aggregate outstanding principal amount of Parity Lien Debt (including outstanding letters of credit whether or not then available or drawn); and

        (b)     other than in connection with the exercise of remedies, the aggregate unfunded commitments to extend credit which, when funded, would constitute Parity Lien Debt.

For purposes of this definition, (a) Parity Lien Debt registered in the name of, or beneficially owned by, the Company or any Affiliate of the Company will be deemed not to be outstanding, and (b) votes will be determined in accordance with the provisions described in Section 6.2 of the Intercreditor Agreement.

"Responsible Officer," means, when used with respect to the Trustee, any officer assigned to the Corporate Trust Office of the Trustee, including any vice-president, assistant vice-president, assistant treasurer or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers and having direct responsibility for the administration of this Indenture, and also, with respect to a particular matter, any other officer to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject.

"Restricted Definitive Note" means a Definitive Note bearing the Private Placement Legend.

"Restricted Global Note" means a Global Note bearing the Private Placement Legend.

"Restricted Investment" means an Investment other than a Permitted Investment.

"Restricted Period" means the 40-day distribution compliance period as defined in Regulation S.

"Restricted Subsidiary" of a Person means any Subsidiary of the referent Person that is not an Unrestricted Subsidiary. Unless otherwise indicated, references to Restricted Subsidiaries shall be deemed to be to Restricted Subsidiaries of Holdings, including the Company.

"Rule 144" means Rule 144 promulgated under the Securities Act.

"Rule 144A" means Rule 144A promulgated under the Securities Act.

"Rule 903" means Rule 903 promulgated under the Securities Act.

"Rule 904" means Rule 904 promulgated under the Securities Act.

"Sale of Collateral" means any Asset Sale involving a sale or other disposition of Collateral.

"SEC" means the Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended.

"Secured Debt" means Parity Lien Debt and Priority Lien Debt.

"Secured Debt Documents" means the Parity Lien Documents and the Priority Lien Documents.

"Secured Debt Representative" means each Parity Lien Representative and each Priority Lien Representative.

"Secured Leverage Ratio" means, on any date, the ratio of:

(1)     the aggregate principal amount of Secured Debt outstanding on such date plus all Indebtedness of Restricted Subsidiaries of the Company that are not Guarantors outstanding on such date (and, for this purpose, letters of credit will be deemed to have a principal amount equal to the face amount thereof, whether or not drawn), to:

(2)     the aggregate amount of the Company's Consolidated Cash Flow for the most recent four-quarter period for which financial information is available.

In addition, for purposes of calculating the Secured Leverage Ratio:

(1)     acquisitions that have been made by the specified Person or any Restricted Subsidiary, including through mergers or consolidations, or any Person or any Restricted Subsidiary acquired by the specified Person or any Restricted Subsidiary, and including any related financing transactions and including increases in ownership of Restricted Subsidiaries, during the four-quarter reference period or subsequent to such reference period and on or prior to the Calculation Date will be given pro forma effect (in accordance with Regulation S-X under the Securities Act but giving effect to Pro Forma Cost Savings) as if they had occurred on the first day of the four-quarter reference period;

(2)     the Consolidated Cash Flow attributable to operations or businesses (and ownership interests therein) disposed of prior to the Calculation Date will be excluded;

(3)     the Fixed Charges attributable to operations or businesses (and ownership interests therein) disposed of prior to the Calculation Date will be excluded, but only to the extent that the obligations giving rise to such Fixed Charges will not be obligations of the specified Person or any Restricted Subsidiary following the Calculation Date;

(4)     any Person that is a Restricted Subsidiary on the Calculation Date (or would become a Restricted Subsidiary on such Calculation Date in connection with the transaction requiring determination of such Consolidated Cash Flow) will be deemed to have been a Restricted Subsidiary at all times during such four-quarter period;